Day, J.
 

 This is an action for the partition of certain real estate in the city of Cleveland, Ohio, title to which was in Martha L. Morison at the time of her death. Martha L. Morison left a last will and testament, which reads as follows:
 

 “I, Martha L. Morison, of the city of Cleveland, county of Cuyahoga and state of Ohio, being about -years of age, and being of sound and disposing mind and memory, do make, publish and declare this my last will and testament, hereby revoking and making null and void all other last wills and testaments by me made heretofore;
 

 “First: My will is that all my just debts and funeral expenses shall be paid out of my estate as soon after my decease as shall be found convenient.
 

 “Second: I give, devise and bequeath to my sister, Charlotte C. Morison all of my personal property. My share in house and lot on Prospect street now known as 866.- My share in property
 
 *155
 
 on Pnblio Square north of Superior street, facing north-west section of Public Square—
 

 “The remainder of my property to be equally divided between Sister Charlotte C., Brother David and Thomas C.
 

 “In case Charlotte C. Morison die within a month of my death, I desire that $5,000 five thousand be given to the Foreign Presbyterian Board of Missions. $5,000 five thousand be given to Home Presbyterian Board of Missions. $1,000 one thousand to Oberlin College. $1,000 one thousand to Young Women Christian Association of Cleveland, $2,000 two thousand to Womens Board of Missions, $1,000 one thousand to my niece, Dora Bucker, one thousand to my niece, Lois Bucker, one thousand to Fanny Morison, daughter of Alexander Morison, $2,000 to Philip Morison, my nephew.
 

 “The remainder of my property to be divided between brother David and Thomas C. Morison.
 

 “Executors David Morison — brother, Judge Carlos Stone, Herbert Wolcott.
 

 “In testimony whereof, I have set my hand to this, my last will and testament, at Cleveland, Ohio', this fourth day of July, in the year of our Lord one thousand eight hundred and ninety-five (95).
 

 “Martha L. Morison.”
 

 The father of Martha L. Morison, David Morison, Sr., was twice married. His first wife was Margaret McKenzie Morison. Of that marriage six children were bom, none of whom survived the testatrix, some of whom, however, did leave children and grandchildren, to-wit, seven children and four
 
 *156
 
 grandchildren, who were related to the testatrix as nieces and nephews and grand nieces and nephews of the half blood. By his second marriage, David Morison, Sr., had six children, one of whom was the testatrix, Martha L. Morison, none of whom survived the testatrix, but two of whom left children who would be nieces and nephews of the testatrix of the whole blood.
 

 To restate the relationship of testatrix to her next of kin, the record shows that on January 22, 1918, the testatrix, Martha L. Morison, left surviving her as next of kin and heirs at law two nieces and two nephews of the whole blood, five nephews and two nieces of the half blood, one of whom is the plaintiff in error, and two grandnephews and two grandnieces of the half blood.
 

 Martha L. Morison died unmarried January 22, 1918, leaving no children either natural or adopted, no descendants of a child or children, no brother or sister, either of the whole or the half blood, but there survived her as heirs representatives of four brothers and sisters of the half blood and representatives of a brother and sister of the whole blood, as above set forth.
 

 Partition of only the ancestral portion of the real estate of which Martha L. Morison died seized, and of which she died intestate, the portion which came to the decedent by descent, devise or deed of gift from an ancestor, was requested in the common pleas court, as it is conceded that the plaintiff in error, being related only in the half blood to the decedent, can partake only of the ancestral portion of the property, as the whole blood
 
 *157
 
 heirs are preferred in the distribution of nonancestral property.
 

 The record discloses that a certain parcel of real estate, which is known as a part of parcel No. 1, as described in the original petition, was quit-claimed on or about April 8, 1908, by Martha L. Morison to a friend, for the purpose, it is said, of clearing a defect of title, and that such friend fifteen days later reconveyed by quitclaim deed to Martha L. Morison the same interest that she owned previous to the transfer, the consideration stated in the deed being the sum of $10.
 

 It is urged by the plaintiff in error that these deeds did not change the ancestral quality of the title of the testatrix and that the title did not thereby become a title by purchase, and in support of that theory the plaintiff in the courts below sought to show by oral testimony the nature and purpose of this transaction, but both courts below held that the ancestral character of the title to that parcel was lost by such conveyance and re-conveyance by quitclaim deeds. It is claimed that this parol testimony offered by plaintiff should have been received for the purpose of showing that there was in fact no consideration, that the grantee held the land in trust for the grantor, and oases are cited in support of that view. We feel, however, that the following cases announce the rule in Ohio:
 

 Groves
 
 v.
 
 Groves,
 
 65 Ohio St., 442, 62 N. E., 1044:
 

 “Where the consideration expressed in a deed of conveyance is a valuable one, the title comes by purchase, and it is not competent to show by parol,
 
 *158
 
 that in fact the title came hy deed of gift, and thereby change the line of descent.”
 

 Thiessen
 
 v.
 
 Moore,
 
 105 Ohio St., 401, 137 N. E., 906:
 

 “The consideration paid for a conveyance of real estate determines its course of descent, and the recital in the deed of conveyance of the payment of the consideration is ‘operative words’ within the meaning and intent of the declaration of this court in the case of
 
 Shehy
 
 v.
 
 Cunningham,
 
 81 Ohio St., 289, and for the purpose of determining the course of descent is conclusive.”
 

 Our conclusion, therefore, is that the title to so much of the real estate of parcel No. 1 as is affected by the quitclaim deed,of testatrix of April 8, 1908, is a title by purchase and that it is not ancestral. This being so, only those who are heirs of the whole blood can share therein.
 

 The second question to be determined is how much of the residual real estate of the testatrix becomes intestate, and a solution of this problem depends upon the construction given to the two remainder clauses contained in the will.
 

 It is the contention of the plaintiff in error that the first general remainder clause passes the residual of the ancestral estate, and that by this clause two-thirds thereof is intestate, while, on the other hand, the defendants in error claim that the second remainder clause is effective, and that one-half of the residual is intestate real estate.
 

 An examination of the will of the testatrix discloses that by item 2 thereof she gave all her personal property and her share of certain real estate to her sister, Charlotte C. Morison, and hav
 
 *159
 
 ing thus disposed of her personal property and all her interest in certain real estate she makes provision for “the remainder of my property to be equally divided between Sister Charlotte C., Brother David and Thomas C.” Then follows the clause by which she bequeaths various sums of money to charitable purposes, and also to certain nieces and one nephew. These bequests begin by the expression “In case Charlotte C. Morison die within a month of my death, I desire that $5,000,” etc. Following this list of special bequests is the second remainder clause of the will, fo'-wit, “The remainder of my property to be divided between Brother David and Thomas C. Morison.”
 

 It thus appears that these two remainder clauses are different, in that in one the sister, Charlotte C., is entirely omitted. In support of the theory that the first remainder clause should control it is urged that, having once disposed of the residuum of her estate, nothing remained for the second remainder clause, to operate upon. It is also urged that in case of two remainder clauses the first should control, a doctrine which has been recognized by some courts. Page on Wills, Section 510; 40 Cye., 1565.
 

 However, the intent of the testatrix, as disclosed by the entire will, should be the main object to be attained, and a court is not permitted to say that the testatrix intended something different than the clear and manifest meaning of the words and phrases used to express her intention. The law presumes that the effect and import of the words used were known to the person making the will, and that such words and expressions used to ex
 
 *160
 
 press the meaning to be conveyed by testator are to be taken in their ordinary and usual signification. Force and effect should be given to all parts of the will if that can be done, but when there is contradiction, or two parts of the will operate to the same effect, the intention must be gathered, if possible, from the entire instrument.
 

 It is apparent that it was the purpose and intent of the testatrix to make ample provision for her sister Charlotte, and, in the event Charlotte did not live to enjoy the bounty provided by the will of the testatrix, or should only survive the testatrix a month, that some of the personal property which would otherwise have gone to Charlotte should be utilized in the bequests to charitable purposes and to the nieces and nephew named in the conditional clause of the will; and, her sister, Charlotte C., not having lived to enjoy the bequests and devises made to her, it was the evident intention of the testatrix that the second remainder clause should become operative and the residuum of her estate pass thereunder. Of course, if Charlotte had survived the testatrix, and lived more than a month thereafter, the first remainder clause would have been effective, and the second would have failed. However, Charlotte died January 22, 1898, nearly twenty years before the testatrix. The fact that Martha L. Morison made this will in 1895, and never changed it down to the date of her death, in 1918, indicates that she- was satisfied with the disposition of the property made by her will; that testatrix knew that her sister had not lived to enjoy the personal property, and that she wanted it disposed of as provided in the con
 
 *161
 
 ditional clause beginning “In case Charlotte C. Morison die within a month of my death * * V’ This being so, it must follow that testatrix was aware that her second remainder clause making no provision for her sister, Charlotte, was the remainder clause that was to,become effective.
 

 Our conclusion, therefore, is that the second remainder clause controls and that the testatrix died intestate as to one-half of the ancestral property The third question is, How shall the said ancestral real estate be distributed? Shall it be distributed
 
 per stirpes
 
 or
 
 per capita
 
 among the legal representatives of the deceased brothers and sisters of the half and the whole blood of decedent?
 

 The title to the heirs at law of Martha L. Morison is acquired by Section 8573, General Code, subdivision 3, which provides:
 

 “When a person dies intestate, having title or right to any real estate or inheritance in this state, which title came to such intestate by descent,
 
 * * *
 
 such estate shall descend and pass in parcenary to his or her kindred in the following course. * * *
 

 “3. If such intestate leave no husband or wife * # * the estate shall pass to and vest in the brothers and sisters of the intestate who are of the blood of the ancestor from whom the estate came, or their legal representatives, whether such brothers and sisters be of the whole or half blood of the intestate.”
 

 Martha L. Morison survived all her brothers and sisters, both of the whole blood and the half blood, and at her death this ancestral property vested in the legal representatives of her brothers and sisters of both the half and the whole blood, and it
 
 *162
 
 is argued that by virtue of Section 8581, General Code, this distribution should be
 
 per capita
 
 and not
 
 per stirpes.
 

 This section 8581 is a very old one. It first appears in volume 3, Ohio Laws, 280, as Section 10 of “An act, regulating the course of descents and distribution of personal estates,” passed February 22, 1805, as follows:
 

 “Sec. 10.
 
 Be it further enacted,
 
 That where any of the before mentioned children, brothers-, sisters or their legal representatives, in the same degree of consanguinity or kindred, come into the partition of any real estate, they shall take
 
 per capita,
 
 that is to say, by persons; but where one or more of them are dead and one or more living, the issue of those dead shall have a right to partition, and such issue, in such case, shall take
 
 per stirpes,
 
 that is to say, the share of their deceased parents.”
 

 The section was carried as a part of an act regulating the course of descent and distribution of real estate, passed December 30, 1815, and is Section 7 of that act, the language being the same. 14 Ohio Laws, 37. It is carried in the same language into the act regulating the course of distribution and descent of property, passed February 11, 1824, and is Section 9 of that act. ‘22 Ohio Laws, 134. Section 10 of the act regulating descents, passed February 24, 1831, carried the same provision in substance as Section 10 of the original act. 29 Ohio Laws, 252; Chase Statutes, vol. 3, p. 1790. By the amendment of March 14, 1853, regulating descents and distribution, Section 10 was divided into Sections 5, 6, 7 and 8. 51 Ohio
 
 *163
 
 Laws, 501. These sections have become respectively 8580, 8581, 8582 and 8583 of the General Code. ■
 

 Section 8581, above referred to, now provides:
 

 “When all the descendants of an intestate, in a direct line of descent, are of an equal degree, of consanguinity to the intestate, whether children, grandchildren, or great-grandchildren, or of a more remote degree of consanguinity to such intestate, the estate shall pass to such persons of equal degree of consanguinity to such intestate in equal parts, however remote from the intestate such equal and common degree of consanguinity may be.”
 

 It is to be noted that this section provides that where the descendants are of “an equal degree of consanguinity to the intestate, * * * the es: tate shall pass to such persons of equal degree of consanguinity to such intestate in equal parts,” etc. If this section applies, it would of course be conceded that if these heirs at law were all nephews and nieces of the whole blood the distribution should be
 
 per capita. Ewers
 
 v.
 
 Follin,
 
 9 Ohio St., 327. But it is urged in this case that, the relationship being that of the whole blood and the half blood, the descendants are not of equal degree of consanguinity to the intestate.
 

 Sections 8581 and 8573, General Code, should be construed
 
 in pari materia,
 
 and by reason of the fact that subsection 3 of 8573 confers upon the half blood an equal degree of inheritable quality, with the whole blood, and places all of such heirs at law upon an equal plane, it is urged that the expression “equal degree of consanguinity to the intestate,” as used in 8581, has the same signifi
 
 *164
 
 canee, to-wit, that having been made of equal inheriting quality with the whole blood, the half blood is, therefore, “of the same degree of consanguinity,” within the meaning of Section 8581.
 

 In the case of
 
 Ewers
 
 v.
 
 Follin, supra,
 
 the nephews and nieces of the intestate inherited
 
 per capita
 
 and the children of a deceased niece inherited
 
 per stirpes.
 

 The construction given Section 8581 in that case has been followed by the lower courts of this state, and its principles have not been disturbed by this court.
 

 In the case of
 
 Treat
 
 v.
 
 Bessey,
 
 1 Ohio App., 125, it was held:
 

 “Where an ancestor dies seized of nonancestral real estate, leaving as next of kin nephews and nieces and issue of a deceased niece, the inheritance descends
 
 per capita
 
 to the nephews and nieces —the issue of the one deceased taking a share by representation.”
 

 In
 
 Treat
 
 v.
 
 Bessey,
 
 at page 129, the following discussion of
 
 Ewers
 
 v.
 
 Follin, supra,
 
 is found:
 

 “It is urged that the subsequent case of
 
 Dutoit
 
 v.
 
 Doyle et al.,
 
 16 Ohio St., 400, is inconsistent with and practically overrules
 
 Ewers
 
 v.
 
 Follin.
 
 In
 
 Dutoit
 
 v.
 
 Doyle et al.
 
 there were surviving children and representatives of other children deceased. It was there contended that the grandchildren took
 
 per capita
 
 in the portion of the estate not taken by the surviving children. It was, however, held by the court that all took
 
 per stirpes.
 
 This decision is not, in our opinion, inconsistent with
 
 Ewers
 
 v.
 
 Follin,
 
 but at most a limitation of Section 6 of the act of 1853 to cases where the descendants are
 
 *165
 
 all of equal consanguinity, that is, all grandchildren and their representatives, or all nephews and nieces and their representatives, and like cases. No criticism or even reference to the case of
 
 Ewers
 
 v.
 
 Follin
 
 is found in the opinion in
 
 Dutoit
 
 v.
 
 Doyle et al.,
 
 and our view that the authority of the former case over cases involving similar facts is not shaken or destroyed is confirmed by the fact that Scott, J., who wrote the opinion in the latter case and Brinkerhoff, J., who concurred therein, also concurred in the decision and opinion in the former case. It is hardly conceivable that these eminent jurists would have overruled their former decision without some comment.”
 

 The cases of
 
 Brower
 
 v.
 
 Hunt,
 
 18 Ohio St., 311,
 
 Martin
 
 v.
 
 Martin, Admr.,
 
 56 Ohio St., 333, 46 N. E., 981,
 
 Mooney, Guardian,
 
 v.
 
 Purpus, Exr.,
 
 70 Ohio St., 57, 70 N. E., 894, and
 
 Miller
 
 v.
 
 Miller,
 
 24 O. C. D., 43, 15 Ohio Cir. Ct. R. (N. S.), 481, are cited, but we find nothing therein inconsistent with
 
 Ewers
 
 v.
 
 Follin
 
 as applied to cases falling within the special provisions of Section 6 of the act of 1853, now Section 8581, General Code.
 

 The case of
 
 Miller
 
 v.
 
 Miller
 
 involved the time of the vesting of a devise. The court, having held that the estate vested at the death of the testator, when two of the brothers were surviving, very properly held that the estate descended
 
 per stirpes,
 
 in harmony with the authority of
 
 Dutoit
 
 v.
 
 Doyle,
 
 16 Ohio St., 400. The case of
 
 Ewers
 
 v.
 
 Follin
 
 has also been followed in
 
 Goff
 
 v.
 
 Disbennet,
 
 14 Ohio Cir. Ct. R. (N. S.), 557. It is further to be noted that in
 
 Dutoit
 
 v.
 
 Doyle
 
 the case of
 
 Ewers
 
 v.
 
 Follin
 
 
 *166
 
 was cited by counsel in their briefs, so that it is quite likely that the same was considered.
 

 As stated by Judge Rockel in his work on Probate Practice (2d Ed.), vol. 1, p. 841:
 

 “This section [8581, G. C.] disturbs the general rule that property descends
 
 per stirpes
 
 and not
 
 per capita.
 
 Under this statute, when all the descendants are of an equal degree of consanguinity, they should share equal. That is, supposing a brother died before his father, leaving three children, and another brother died leaving nine children, the estate then would be divided into twelve equal parts, the children of one brother receiving one-fourth and the other three-fourths. If one brother would have been living at the death of his parent, the estate would then have been divided into two equal parts, the living brother receiving one part and the children of the dead brother the other.”
 

 In view of the fact that these next of kin of the intestate take by representation of their fathers and mothers, who were the brothers and sisters of the intestate, it might seem that they would take
 
 per stirpes,
 
 but legislative action has provided a different rule, and, since it has been held that Section 8581 applies to nephews and nieces inheriting from an intestate, we do not feel at this time justified in changing such holding. It is also suggested that the language “when
 
 all
 
 the descendants,” etc., prevents 8581 from applying, because nephews and nieces and great nephews and great nieces are not
 
 all
 
 of the same degree of consanguinity, yet the language of what is now
 
 *167
 
 Section 8581, General Code, is practically the same as the language of the act in force when
 
 Ewers
 
 v.
 
 Follin, supra,
 
 was decided. The statute then read (Section 6):
 

 “The provisions of the last preceding section shall apply in every case in which there are several descendants in a direct line of lineal descent, and
 
 all of equal degree
 
 of consanguinity to such intestate.”
 

 In view of the legislative mandate of Section 8581, General Code, and the interpretation placed upon it in
 
 Ewers
 
 v.
 
 Follin, supra,
 
 we are constrained to the conclusion that the distribution of this ancestral real estate should he
 
 per capita
 
 among the nieces and nephews of both the whole and the half blood of Martha L. Morison and
 
 per stirpes
 
 among the great nephews and nieces of the half blood. This is the conclusion reached by the Court of Appeals, and the judgment of the Court of Appeals is therefore affirmed.
 

 Judgment modified, and affirmed as modified.
 

 Marshall, C. J., Robinson, Jones, Matthias and Allen, JJ., concur.
 

 Wanamaker, J., not participating.